## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

IAN MCCARTHY,                         )

                                )

     Plaintiff,               )

                                )    **Civil Action No. 4:19-cv-2913**

v.                             )

                                )    **COMPLAINT AND**

JUUL LABS, INC., PAX LABS, INC.,    )    **DEMAND FOR JURY TRIAL**

ALTRIA GROUP, INC., and        )

PHILIP MORRIS USA, INC.         )

                                )

     Defendants.             )

                                )

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Ian McCarthy, by and through his undersigned counsel, brings this Complaint against the

Defendants JUUL Labs, Inc., PAX Labs, Inc., Altria Group, Inc., and Philip Morris USA, Inc.

("Defendants") and alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff, Ian McCarthy, is thirty-five years old and a resident of Saint Charles

County, Missouri. Plaintiff resides in, purchased the product at issue in, and suffered injury as a

result of the product at issue in Saint Charles County, Missouri.

2.    Defendant JUUL Labs, Inc. ("JUUL Labs") is Delaware corporation, having its

principal place of business in San Francisco, California.

3.    Defendant JUUL Labs manufactures, designs, sells, markets, promotes, and

delivers JUUL devices into the stream of commerce. JUUL Labs distributes the JUUL device in

all fifty states, including Missouri.

4.    Defendant PAX Labs, Inc. is a Delaware corporation, having its principal place of

business in San Francisco, California. Defendant JUUL Labs previously operated under PAX Labs, Inc. ("PAX Labs") but spin out as an independent company in 2017. A substantial portion of the conduct described herein occurred while JUUL Labs operating under PAX Labs.

5.      Defendant Altria Group, Inc. ("Altria") is a Virginia corporation, having its principal place of business in Richmond, Virginia.  Altria Group is an investor in JUUL Labs.

6.      Defendant Philip Morris USA, Inc. ("Philip Morris") is a Virginia corporation, having its principal place of business in Richmond, Virginia.  Philip Morris is a wholly owned subsidiary of Altria.

7.      Defendants Altria Group and Philip Morris (collectively "Altria Defendants") are thirty-five percent owners in JUUL Labs. Altria Defendants acquired partial ownership in JUUL Labs to sell, promote, market, and distribute JUUL devices into the stream of commerce.

8.      Pursuant to JUUL Labs' website, and a service agreement, Altria Defendants provided access to its premier innovative tobacco products retail shelf space, which allow JUUL Labs' tobacco and menthol-based products to appear alongside combustible cigarettes. Altria Defendants further enabled JUUL Labs to reach smokers with direct communication through pack inserts and mailings to smokers via Altria companies' databases. Lastly, Altria Defendants applied its logistics and distribution experience to assist JUUL Labs in expanding its reach and efficiency; Altria Defendants provided JUUL Labs with the option to be supported by Altria's sales organization, which covers more than 230,000 retail locations.

9.      Defendants are individually, jointly and severally liable to Plaintiff for damages suffered by Plaintiff Ian McCarthy arising from Defendants' design, manufacture, marketing, labeling, distribution, sale and placement of JUUL devices in the stream of commerce, conducted directly or indirectly through their respective agents, servants, employees and/or owners, all acting

within the course and scope of their representative agencies, services, employees and/or ownership.

10.     Defendants are vicariously liable for the acts and/or omissions of its employees and/or its agents who were at all times relevant hereto acting on behalf of Defendants and within the scope of their employment or agency with Defendants.

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 based on complete diversity of citizenship between the Plaintiff and all Defendants and the amount in controversy exceeding $75,000, exclusive of interests and costs.

12.     This Court has personal jurisdiction over each of the Defendants pursuant to the Missouri Long-Arm Statute (Mo. Rev. Stat. § 506.500).  Defendants actively conduct business in Missouri, and Defendants conducted tortious acts and omissions in Missouri.  Defendants' tortious acts and omissions caused injuries to Plaintiffs in the state of Missouri.  Defendants purposely availed themselves of the benefits and protections of the state of Missouri, by either directly or indirectly promoting, marketing, publishing information, selling and/or distributing JUUL devices in this State, for which they derived significant and regular income.  Defendants purposely directed their activities to the state of Missouri and reasonably expected that JUUL devices would be advertised, marketed, and sold to consumers in Missouri. Because Defendants have sufficient minimum contacts with this State to render the exercise of jurisdiction by this court proper.

13.     Venue is proper in the Eastern District of Missouri pursuant to 28 U.S.C. §1391(b)(2) in that a substantial part of events or omissions giving rise to the claim occurred in this district.

## FACTUAL ALLEGATIONS

### A. THE JUUL DEVICE

14.     JUUL quickly took the market by storm and rose in popularity among adults and youth.  Since its launch in 2015, JUUL has become a dominant e-cigarette manufacturer in the United States.  By 2017, JUUL became the most popular e-cigarette in the United States, and eventually gained nearly three-fourths of the e-cigarette market share in 2018 making it one of the world's most successful and fastest growing e-cigarette brands of all time.

15.     JUUL utilizes a cartridge-based e-cigarette design. The cartridges are called pods or JUULpods. According to JUUL Labs' website, JUULpods heat up a cartridge containing oils and nicotine to create an aerosol that is roughly equal to 200 cigarette puffs.  Meaning JUULpods have a significantly higher concentration of nicotine than cigarettes resulting in nicotine to be absorbed by the body at a higher rate than cigarettes.

16.     JUUL devices deliver nicotine more effectively and at higher doses than traditional cigarettes and most other e-cigarettes.  JUUL has more than twice the amount of nicotine concentrate than any other cigarette or e-cigarette product, increasing one's risk for addiction.

17.     Each JUULpod contains fifty-nine milligrams of nicotine per milliliter of liquid. While JUUL has claimed that one pod is equal to a pack of cigarettes in terms of nicotine, tobacco experts claim the precise equivalency is difficult to determine because not all the nicotine released in cigarette smoked is inhaled, and some is trapped in the filter.  Because of JUUL's exorbitant levels, the product is not sold in the European Union.

18.     The JUUL device is small and sleek, with a design that allows it to be easily concealed and fit in a closed fist – making its appearance similar to common products such as

writing pens, USB flash drives, and even cigarettes. The JUUL device may be easily concealed from parents and teachers, making it attractive to youth and teens.

19.     JUULpods come in a variety of flavors, including Virginia Tobacco, Mint, Classic Tobacco, Mango, Crème, Cucumber, Fruit, and Menthol. Research shows that these flavors play a key role in attracting youth to use JUUL devices. Because of this, the U.S. Food and Drug Administration ("FDA") has proposed bans on fruit flavored JUULpods.

20.     JUUL e-cigarettes and JUULpods deliver dangerous toxins and carcinogens to users. The ingredients in JUULpods include nicotine, propylene glycol, glycerin, benzoic acid, and chemical flavoring. When combined, these ingredients produce potentially harmful compounds known as acetals. When inhaled, these acetals are irritating to the body's airways and may even result in severe lung damage.

21.     In the 1960s Philip Morris pioneered a chemical process that converted the naturally occurring nicotine salts in tobacco leaves into freebase nicotine. Using ammonia, Philip Morris deprotonated the positively charged nicotine acid salt to become neutral – in other words, Philip Morris stripped away the naturally occurring nicotine salts in leaf tobacco with ammonia. This neutral, deprotonated nicotine is "free" in that it is no longer bound to another molecule in the form of salt. The result is a freebase nicotine – nicotine in its purest form.

22.     When creating JUUL, PAX Labs – now JUUL Labs – utilized Philip Morris' strategy. JUUL took the freebase nicotine created by Philip Morris and added benzoic acid to set off a chemical reaction that produced the modern e-juice, also known as "JuulSalts" or nicotine salts. These nicotine salts are absorbed into the body at almost the same speed as nicotine in regular cigarettes, a speed that comes from the use of freebase nicotine.

23.     Unlike the freebase nicotine in regular cigarettes, which can be very irritating, nicotine salt goes down smoothly and doesn't cause the immediate, unpleasant feeling in the chest and lungs that cigarette smoke does.  According to JUUL's patent for JuulSalts, not only is the nicotine level higher in benzoic acid nicotine salts but it crosses the blood brain barrier more readily and allows for a smoother throat hit.  The vapor also does not have the same odor as cigarettes and can emit a pleasant whiff of fruit or other flavors – or no odor at all.  By using JUUL, vapers can get the same nicotine effect as cigarettes, but more discreetly and without the immediate pesky irritation – making it easier for users to start on these products and quickly become addicted without realizing.

24.     In addition to JUUL's nicotine salts, JUUL differs from other current e-cigarettes in that JUUL uses silica wicking material instead of cotton.  From a sales perspective, the greatest advantage of using silica is its shelf life.  Unlike the cotton wicks utilized in current e-cigarette cartridges, silica does not deteriorate as quickly – lessening the worry about excess inventory and turning over JUULpods as quickly to consumers.  However, the use of silica is concerning.  In the early days of e-cigarettes, silica was widely used by companies.   Eventually, e-cigarettes companies stopped using silica after studies showed that silica can lead to build in the lungs and breathing passages causing scarring and difficulty breathing.

25.     JUUL's use of nicotine salts coupled with the use of a silica wicking material have allowed JUULpods to exceed the nicotine dose of a traditional cigarette or other e-cigarette product, while also having a longer shelf life.

### B.  HARMFUL EFFECTS OF NICOTINE

26.     Addiction is characterized by compulsive drug-seeking and use, even in the face of negative health consequences.  Consuming nicotine leads to the release of chemical dopamine in

the human brain.  With every inhalation of nicotine from an e-cigarette, the brain gets a "hit" of dopamine reinforcing the brain to repeat the same behavior.  This repeated vicious cycle increases the risk of addiction among e-cigarette users.

27.     In addition to being highly addictive, nicotine is well known to have serious systemic side effects.  Nicotine adversely affects the heart, reproductive system, lungs, kidneys, and much more.

28.     The JUUL device delivers high amounts of nicotine than traditional cigarettes, resulting in JUUL being just as, if not even more, addictive than traditional cigarettes.

## C. DEFENDANTS DESIGNED AND MANUFACTURED A PRODUCT THAT GENERATED UNPARALLELED NICOTINE ADDICTION AND RISKS

29.     Introduced in 2015, JUUL e-cigarettes have skyrocketed in popularity among youth across the United States, leading to an e-cigarette epidemic.

30.     JUUL devices were designed with sleekness and secrecy in mind.  Resembling a USB drive, JUUL can be easily concealed and used in public spaces.

31.     JUULpods come in a variety of flavors, including Virginia Tobacco, Mint, Classic Tobacco, Mango, Crème, Cucumber, Fruit, and Menthol.

32.     The ease of concealment and variety of flavor options make JUUL a popular tobacco product among youth.  Studies show that most youth who experiment with tobacco begin with a flavored tobacco product, as flavored products are more appealing.

33.     JUUL products deliver more nicotine than the company lets people know about.  Through the use of JuulSalts or nicotine salts not only are the nicotine levels more potent, but the nicotine crosses the blood brain barrier more readily.

34.     Further, the JUUL device does not have a manual or automatic "off" switch.  Neither the JUULpod nor the programming of the JUUL device's temperature or puff duration

settings limit the amount of nicotine JUUL delivers, allowing users, especially minors, to take in large amounts of nicotine with each puff.  Thus, in contract to a traditional cigarette, which self-extinguishes as each cigarette is consumed, the JUUL allows non-stop nicotine consumption, which is limited only by the device's battery.  As a result, JUUL allows a user to consume extraordinarily high levels of nicotine than a traditional cigarette.  This makes it easier for the user to become addicted to nicotine and poses severe health risks.

35.     Pursuant to data and statistics produced by the Center for Disease Control ("CDC"), over four million middle and high school students use at least one tobacco product, including e-cigarettes.  In recent years, mostly otherwise healthy teens and individuals in their 20s have shown up to the emergency room with severe shortness of breath, often after suffering several days with vomiting, fever, and fatigue. As of October 2019, thousands of injury cases across forty-nine states and one United States territory have been associated with the use of e-cigarette, or vaping, products.  Of these injuries, dozens of deaths have been confirmed in twenty-one states.

36.     JUUL is more harmful when compared to traditional cigarettes, in that the exorbitantly high levels of nicotine not only lead to nicotine addiction, but heightened blood pressure and stroke.  The repetitive exposure to the toxins and chemicals in JUUL can also cause vascular damage and stroke.

37.     In creating a sleek device and utilizing a special e-juice known as JuulSalts or nicotine salts, Defendants placed a highly addictive product into the stream of commerce that could be readily concealed.  Based on information and belief, Defendants manufactured an even more addictive product than the one they designed.  As a result, the FDA and White House Administration have taken action to address the epidemic Defendants caused.

### D. DEFENDANTS FAILED TO ADEQUATELY WARN CONSUMERS THAT THEIR PRODUCT WAS UNSAFE, ADDICTIVE, AND DANGEROUS

38.     Despite making numerous changes to its packaging since 2015, JUUL did not add nicotine warnings until it was forced to do so in August of 2018.

39.     Prior to August 2018, there were no warnings about the existence of nicotine or the risks of nicotine addiction on any JUUL products or JUUL packaging. Specifically:

    i.   There were no nicotine warnings on the JUUL device;

    ii.  There were no nicotine warnings on the JUULpods;

    iii. There were no nicotine warnings on the JUUL device packaging; and

    iv.  There were no nicotine warnings on the JUULpods packaging.

40.     At all relevant times, Defendants knew that JUUL products were not safe for non-smokers and posed a risk of aggravating nicotine addiction in those already addicted to cigarettes. JUUL failed to adequately warn consumers that their products were unsafe, addictive, and dangerous.

41.     Defendants failed to disclose that even though their product delivered about as much nicotine as a traditional cigarette, the actual amount of nicotine consumed from a JUULpod is twice as high as traditional cigarettes.  In failing to disclose this material information, Defendants did not adequately warn consumers about the risks of nicotine addiction and other health complications.

42.     Defendants failed to warn users that its products have not been found to be safe and effective by the FDA for the purpose of quitting traditional cigarettes.

43.     Defendants' failure to warn Plaintiff and the public about the risks and side effects associated with JUUL products resulted in a nicotine epidemic and other severe adverse aftereffects.

44.     As a result of Defendants' failure to warn the public, the FDA has intervened and requested that JUUL Labs make several changes to its campaigns and provide documentation to support the claims it has publicly made.

**E. DEFENDANTS INTENTIONALLY MISREPRESENTED AND FLAGRANTLY DOWNPLAYED THE SAFETY HAZARDS OF USING THEIR PRODUCT AND AMOUNTS OF NICOTINE IN EACH JUUL DEVICE**

45.     JUUL's labeling, advertising, and other activities directed to consumers, as one would reasonably expect, resulted in consumers believing that JUUL products:

      i.   Present a lower risk of tobacco-related disease or are less harmful than one or more other commercially marketed tobacco products;

      ii.   Contain a reduced level of a substance or present a reduced exposure to a substance; and/or

      iii.   Do not contain or are free of a substances or substances.

46.     JUUL Labs' mission statement reads in part: "We envision a world where fewer people use cigarettes, and where people who smoke cigarettes have the tools to reduce or eliminate their consumption entirely, should they so desire."  In making such statements, JUUL Labs has misrepresented that JUUL is a healthy and safe product.  What Defendants failed to inform the public of is that JUUL products deliver a highly concentrated dose of nicotine and create or extend addiction in people who did not realize the health risks of using JUUL.  Since the creation of their product, Defendants have and continue to misrepresent the safety hazards associated with JUUL products.

47.     JUUL Labs participated in school programs in which they sent JUUL representatives to speak with youth about their products.  During a presentation with students, a JUUL representative made several statements:

    i. JUUL "was much safer than cigarettes" and that the "FDA would approve it any day."

    ii. JUUL was "totally safe."

    iii. A student "…should mention JUUL to his [nicotine-addicted] friend…because that's a safer alternative than smoking cigarettes, and it would be better for the kid to use."

    iv. "FDA was about to come out and say it [JUUL] was 99% safer than cigarettes…and that…would happen very soon."

48. JUUL has fraudulently concealed material information about the addictive nature of its products. Plaintiff's claims arise out of JUUL's fraudulent concealment and misrepresentation of material facts concerning the JUUL device and its nicotine contents, addictiveness, and psychological effects.

49. At all relevant times, Defendants knew that JUUL e-cigarettes were not safe for non-smokers and posed a risk of aggravating nicotine addiction in those already addicted to cigarettes. JUUL was under a duty to disclose this material information to consumers based upon their exclusive knowledge; yet JUUL never disclosed this important safety information to Plaintiff or the public.

50. Instead of disclosing the risks and adverse side effects associated with their product, Defendants made several statements and misrepresentations during their "Make the Switch" Campaign including:

    i. "'[JUUL is] a smart, really well thought-out alternative to smoking.' Make the switch."

    ii.   "I think [JUUL is] an amazing invention…I don't know how we lived without that. The alternative for adult smokers."

    iii.   "Elimination of combustible cigarettes is crucial to reduce risk of harm."

    iv.   "Improve the lives of the world's one billion adult smokers."

51.    As described above, Defendants flagrantly downplayed the safety hazards and risks associated with JUUL products.

52.    JUUL advertised and maintained that each JUULpod contained about as much nicotine as a pack of cigarettes – such statements were in fact false and likely to mislead.  As Defendants know, it is not just the amount of nicotine, but the efficiency with which the product delivers nicotine into the bloodstream, that determines a products risk of addiction. Defendants knew that benzoic acid affects pH and the penetration of nicotine in cell membranes.

53.    While the amount of nicotine contained in one JUULpod is equivalent to the level of nicotine in a pack of cigarettes, the actual amount of nicotine consumed via one JUULpod is twice as high as the nicotine consumed in a pack of traditional cigarettes.

54.    JUUL failed to inform Plaintiff and the public that its products have not been found to be safe and effective by the FDA for the purpose of attempting to quit traditional cigarettes.

## F.  DEFENDANTS TARGETED MINORS WHILE MARKETING AND CREATING THEIR PRODUCT AND CREATED A YOUTH NICOTINE ADDICTION CRISIS

55.    JUUL Labs collaborated with Altria Defendants to target minors while marketing and creating their product.  As a direct and proximate result of this collaboration between the Defendants, a youth nicotine addiction took the United States by storm.

56.    Philip Morris, an Altria subsidiary, has a long history of marketing tobacco products to youth.

12

57.     From the 1950s to the present, Philip Morris intentionally marketed traditional cigarettes to young people under the age of twenty-one.  In an article in the US *Tobacco Journal* Philip Morris was noted to have acknowledged that there was massive potential in marketing to women and young adults to secure the long term future of Big Tobacco.  In fact, a Philip Morris executive was quoted as saying that: "Students are tremendously loyal. If you catch them, they'll stick with you like glue." *See* P.J. Hilts, *Smokescreen – The Truth Behind the Tobacco Industry Cover-Up*, 66, 76-77, Addison Wesley (1996).

58.     Executives from Philip Morris acknowledged that marketing to youth was worth the high cost to reach them because youth are more willing to experiment and have more influence over others in their age group. *Id.* at 77.  Essentially, Philip Morris targeted youth to recruit "replacement smokers" and ensure the economic future of their company.

59.     Philip Morris was well aware that marketing cigarettes to youth was essential to the company's success and longevity, and for that reason, it created marketing campaigns to increase youth consumption.

60.     An internal memorandum dated March 31, 1981, sent by Philip Morris marketing research Myron Johnston stated: "It is important to know as much as possible about teenage smoking patterns and attitudes.  Today's teenage is tomorrow's potential regular customer, and the overwhelming majority of smokers first begin to smoke while still in their teens." *See Young Smokers: Prevalence, Trends, Implications, and Related Demographic Trends*, p. 6.

61.     To accomplish this goal, Philip Morris tracked youth behavior and preference; employed marketing themes that resonated with youth; and promoted cigarettes to youth through retail promotions, events, and sponsorships.  Philip Morris intentionally exploited adolescents' vulnerability to imagery by creating advertisements that utilized the themes of independence,

adventurousness, glamour, athleticism, social inclusion, sexual attractiveness, thinness, and popularity.  Philip Morris' marketing tactics consistently reached millions of teens.

62.     Following a lengthy legal battle and despite denying that they marketed to youth, Philip Morris was found to have engaged in unlawful coordinate activity to "recruit new, youth smokers through cigarette marketing." *See* United States v. Philip Morris USA, Inc., 449 F. Supp. 2d 1 (D.D.C. 2006).  The Racketeering Acts associated with Philip Morris' youth marketing consisted of advertisements that appeal to and target youth, the designs of which are based on its research on teenage behaviors and preferences. *See id.*

63.     The Altria Defendants have not abandoned their youth-appealing themes. Up until it acquired a thirty-five percent stake in JUUL, Altria Defendants had their own e-cigarettes, the MarkTen products, which Altria has conceded was popular among youth.

64.     Following Altria's acquisition of JUUL Labs, the Altria Defendants granted JUUL Labs exclusive access to their tobacco product retail shelf space and further assisted JUUL Labs in selling and marketing their product.

65.     JUUL Labs replicated Philip Morris' youth marketing playbook to addict youth to nicotine.  JUUL Labs adopted the same themes used by Altria Defendants in the cigarette industry's long-standing, extensive advertising campaign to glamorize cigarette smoking while downplaying its addictiveness and harmful health effects.

66.     Statements by JUUL's founder and employees further highlight JUUL's intent to develop a highly addictive product to sell to a new audience of non-smokers. James Monsees, one of JUUL's founders, described the cigarette as "the most successful consumer product of all time…an amazing product." According to Monsees, JUUL aimed to "deliver[] solutions that refresh the magic and luxury of the tobacco category."

67.     JUUL used the tobacco industry's prior practices as a playbook. In fact, Monsees publicly admitted that JUUL began looking at tobacco industry documents, including board meeting minutes. "It became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."

68.     JUUL's research included documents about how tobacco companies had chemically manipulated nicotine content to maximize delivery: "We started looking at patent literature. We are pretty fluent in 'Patentese.' And we were able to deduce what had happened historically in the tobacco industry."

69.     Based on the above information, statements, and belief, Altria Defendants and JUUL Labs are working in concert to market and advertise JUUL products to youth and teenagers and the Defendants' association has increased the likelihood of e-cigarette use and nicotine addiction among minors.

## G.  IAN MCCARTHY'S USE OF JUUL PRODUCTS RESULTED IN HIS ADDICTION TO NICOTINE AND OTHER SEVERE INJURIES

70.     Ian McCarthy is a thirty-five-year-old man, who is described by many as a hard worker and stellar employee.

71.     As an employee of Express Scripts, Ian McCarthy was fortunate to have received several promotions and held several positions throughout his employment with the company. When Ian initially began his employment in 2013, he was employed as a Business Analyst – Ian was later promoted several times to Senior Business Analyst, Software Developer, and lastly Web Development Specialist (the highest position).

15

72.    Ian was passionate about his work at Express Scripts and looked forward to creating new projects.  Ian held a passion for graphic design and animation, which shined through his work and helped him receive numerous promotions.

73.    As a former smoker of traditional cigarettes, Ian McCarthy began using JUUL products as a way to "make the switch" from cigarettes.  According to JUUL Labs, JUUL was an excellent product for smokers who wanted to switch from cigarettes and find a better alternative. As a result, Ian believed JUUL was a less harmful substitute to cigarettes.

74.    Ian McCarthy's prior cigarette use was light.  Ian smoked a couple of cigarettes per day, and a pack lasted him several days.  However, as a JUUL user, Ian felt an immense urge to use JUUL products. After only using JUUL for a short time, Ian's JUUL use escalated and became a severe problem that affected his work and life.  Eventually, Ian became accustomed to using JUUL every few minutes all day long, and he would feel nervous if he didn't use it or have it near him.

75.    Ian McCarthy's addiction had an extreme effect on his behavior.  Ian became withdrawn, irritable, and distressed.  Ian suffered from severe anxiety as a result of his JUUL use. Ian's anxiety eventually became so overwhelming, he was forced to take a leave from work; this eventually led to Ian permanently leaving his job and losing a bonus that was awarded to employees a few months later.

76.    In addition to nicotine addiction, Ian suffered from dental complications due to his JUUL use. Following months of JUUL use, Ian suffered from at least cavities, tooth decay/erosion, and gum inflammation.

77.    Ian's severe nicotine addiction and adverse side effects led him to seek treatment from several health professionals.  To address his debilitating anxiety, Ian sought treatment from

a doctor at Alternative Behavior Care in St. Peters, Missouri.  Ian also sought treatment for his dental problems from a dentist in Bridgeton, Missouri.

78.     As a direct and proximate result of Defendants' conduct and defective design, and Ian McCarthy's use of JUUL products, Ian is suffering from severe nicotine addiction and other severe injuries, including anxiety.

### FIRST CAUSE OF ACTION
### Violation of the Racketeer Influenced and Corrupt Organization Act ("RICO")
### 18 U.S.C. Sec. 1962(c)

79.     Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if each were fully and completely set forth herein and further alleges as follows:

80.     Defendants are all "persons" under 18 U.S.C. § 1961(3).

81.     Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of a RICO enterprise through a pattern of racketeering activity.

82.     Since at least as long as JUUL Labs and the Altria Defendants entered into an agreement with respect to JUUL products, and continuing up to and including the date of the filing of this complaint, Defendants have constituted an "enterprise" as the term is defined in 18 U.S.C. § 1961(4), that is, a group of business entities and individuals associated in fact, which is engaged in, and the activities of which affected, interstate commerce and foreign commerce.  Each Defendant participates in the operation and management of such Enterprise.

83.     The Enterprise is functioning to achieve shared goals through unlawful means including to deceive consumers, particularly parents and children, by claiming that they did not market to children, while engaging in marketing and advertising with the intent of addicting children into becoming lifetime nicotine users.

84.     The RICO Enterprise has an ongoing organization with an ascertainable structure and functioned as a continuing unit with separate roles and responsibilities.

85.     While Defendants participated in the conduct of the RICO Enterprise, they have an existence separate and distinct from the RICO Enterprise.

86.     At all relevant times, Defendants operate, control or manage the RICO Enterprise through a variety of actions. The participation of Defendants in the RICO Enterprise is necessary for the successful operation of their scheme to market the JUUL nicotine device to children, which is the common purpose of the RICO Enterprise.

87.     At all relevant times, Defendants conducted and participated in the conduct of the affairs of the RICO Enterprise through a pattern of racketeering activity that consists of numerous and repeated violations of federal mail and wire fraud statutes. These statutes prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

88.     As detailed in the General Factual Allegations, Defendants know that marketing JUUL e-cigarettes to youth is essential to Defendants' success and longevity, and for that reason, they partnered to create marketing campaigns to increase youth consumption, while fraudulently denying they are doing so. Defendants have furthered this scheme to profit.

89.     To carry out, or attempt to carry out the scheme to defraud, the Defendants have conducted or participated in the conduct of the affairs of the RICO Enterprise through the following pattern of racketeering activity that employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud):

> i.   The Defendants devised and furthered the scheme to defraud by use of the mail, telephone, and internet, and transmitted, or caused to be transmitted,

by means of mail and wire communication travelling in interstate or foreign commerce, writing(s) and/or signal(s), including the Defendants' websites, communications with the FDA, statements to the press, and communications with other members of the RICO Enterprise, as well as advertisements and other communications to JUUL users; and

ii.  The Defendants utilize the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described herein.

90.  The Defendants' conduct in furtherance of this scheme was intentional. Plaintiffs and class members were directly harmed as a result of the Defendants' intentional conduct. Plaintiffs, class members, among others, relied on the Defendants' material misrepresentations and omissions concerning their fraudulent statement with respect to targeting children.

91.  The predicate acts all had the purpose of generating significant revenue and profits for the Defendants at the expense of Plaintiffs and Class Members.

92.  The Defendants' violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiff and Class Members, and Plaintiffs and Class Members are entitled to bring this action for three times their actual damages, as well as injunctive and equitable relief and costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c). Equitable relief is necessary to ensure an end to Defendants' continued effort to deceptively campaign to induce children and minors to become addicted and subject to a high risk of disease.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and requests compensatory damages, punitive

damages, together with interest, cost of suit, attorneys' fees, and such further relief as the court deems equitable and just.

## SECOND CAUSE OF ACTION
### Fraud

93.     Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if each were fully and completely set forth herein and further alleges as follows:

94.     At all relevant times, Defendants' marketed, promoted, and/or sold JUUL products as safe, efficacious, and suitable for consumers.

95.     JUUL products are not sage, efficacious, and suitable for consumers.

96.     The Defendants' marketed, promoted, and/or sold JUUL products as safe, efficacious, and suitable for consumers with the intent that youth and traditional cigarette smokers would utilize JUUL products, increasing the Defendants' profits.

97.     Plaintiff utilized JUUL products because he believed JUUL was safe, efficacious, and suitable for consumers, because the Defendants' deceptively marketed, promoted, and/or sold JUUL as such.

98.     Defendants, form the time they first tested, studied, researched, evaluated, endorsed, manufactured, marketed, and distributed JUUL product, and up to the present, knew and willfully deceived Plaintiff, the FDA, and the general public as to the true facts concerning JUUL, which Defendants had a duty to disclose.

99.     Defendants are the sole bearer of the true, accurate, unaltered information, test, studies, and data of the safety, efficacy, and suitability of JUUL products for consumers, and therefore the Plaintiff and the general public had no reason or information to believe that the Defendants claims were in fact false.

100.    The Plaintiff intended to select a safe and efficacious consumer product that was a suitable and "healthier" alternative to traditional cigarette smoking, and selected the Defendants' JUUL products because of the false claims that the Defendants made about the safety, efficacy, and suitability of JUUL as an alternative to "make the switch."

101.    JUUL has styled itself as something different than Big Tobacco.  For example, in a previous JUUL campaign, JUUL expressly stated: "FACT: JUUL Labs is not Big Tobacco.  We are an independent vapor company on a mission to eliminate cigarettes."  That has proved to false. In a $12.8 billion transaction that took place in December 2018, tobacco giant, Altria, acquired a thirty-five percent stake in JUUL Labs to partner with the company.  JUUL has embraced "big tobacco," a disturbing and frightening reality for today's consumers and youth.

102.    Defendants are the sole bearer of the true, accurate, unaltered information, and data on the safety, efficacy, and suitability of JUUL products, and therefore the Plaintiff had no other option but to rely on the Defendants' representations.

103.    As a direct and proximate result of the Plaintiff's reliance on Defendants' misrepresentations, Plaintiff has been injured, sustained severe permanent pain, suffering, impairment, loss of enjoyment of life, comfort, and economic damages.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and requests compensatory damages, punitive damages, together with interest, cost of suit, attorneys' fees, and such further relief as the court deems equitable and just.

### THIRD CAUSE OF ACTION
### Strict Product Liability – Defective Design

104.    Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if each were fully and completely set forth herein and further alleges as follows:

105.    Defendants designed, developed, manufactured, marketed, sold, and distributed JUUL products.

106.    At the time of Ian McCarthy's use of JUUL products, JUUL was defectively designed.  As described throughout this Complaint, there was an unreasonable risk that the product would not perform safely and effectively for the purposes for which it was intended, and Defendants failed to design against such dangers, and failed to provide adequate warnings and instructions concerning these risks.

107.    Defendants expected and intended that JUUL products reach consumers such as Plaintiff in the condition in which the product was sold.  JUUL e-cigarettes did in fact reach Plaintiff without substantial change in the condition in which they were designed, developed, manufactured, marketed, sold, and distributed by Defendants.

108.    Plaintiff's use of JUUL products – inhaling JUUL's flavored vapors – was reasonable and was the type of use that Defendants intended and foresaw when it designed, manufactured, and sold the product.

109.    Defendants knew or should have known that JUUL e-cigarettes were in a defective condition and not reasonably safe for their intended use.

110.    Defendants knew or should have known that JUUL e-cigarettes were extremely addictive and would result in the user becoming addicted to nicotine and being at risk for serious health problems.

111.    When creating JUUL, PAX Labs – now JUUL Labs – utilized Altria Defendants' strategy of using freebase nicotine and built on their foundation to create an even more addictive product than traditional cigarettes.  By adding benzoic acid to the freebase nicotine created by Philip Morris, JUUL created a modern e-juice known as "JuulSalts" or nicotine salts.  These

nicotine salts are absorbed into the body at a higher rate, cross the blood brain barrier more readily, and allow for a smoother throat hit.  By using JUUL, consumers can get the same nicotine effect as cigarettes, but more discreetly and without the immediate pesky irritation – making it easier for users to start on these products and quickly become addicted without realizing.  With this knowledge, Defendants designed JUUL e-cigarettes in a defective condition for consumption by the public and by Plaintiff Ian McCarthy.

112.    Defendants could have designed a safer e-cigarette that would contain far less nicotine or would contain nicotine in a formulation which was less likely to addict its users.

113.    In addition, Defendants could have designed an e-cigarette that was far less likely to appeal to children and other persons not already addicted to nicotine by only offering tobacco flavors and not the candy-like flavorings JUUL products did offer.

114.    In addition, Defendants could have designed an e-cigarette that did not gratuitously flash rainbow colors when waved around, which had the effect of enticing young users.

115.    Instead, Defendants designed JUUL e-cigarettes to deliver high levels of nicotine and in formulation that was certain to result in JUUL users becoming addicted to nicotine.

116.    Further, Defendants offered JUUL products in candy-like flavors which appealed to children and other persons who were not already addicted to nicotine.

117.    These defects were a substantial factor in Plaintiff becoming addicted to nicotine and suffering from other severe injuries as described above in the factual allegations.

118.    Additionally, to the extent any claims are made under the laws of the State of Missouri, including but necessarily limited to the claims of Plaintiff, and the extent this Court finds that Missouri statutory laws found at Mo. Rev. Stat. §§ 537.760 *et seq.* are applicable to this case, Plaintiff alleged that Defendants manufactured, transferred, sold JUUL products in the course of

its business, the products were used by Plaintiff in a reasonably anticipated manner, the JUUL e-cigarettes and pods were defectively designed and unreasonably dangerous and carried a defective warning at the time of sale.  JUUL products caused Plaintiff's injuries.  JUUL e-cigarettes and pods were expected to and did reach the Plaintiff without substantial change in their condition.

119.    Plaintiff states that Defendants are liable under the provisions of Mo. Rev. Stat. §§ 537.760 *et seq.*

120.    As a direct and proximate result of the defective and unreasonably dangerous condition of JUUL e-cigarettes, Plaintiff suffered injuries and damages.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and requests compensatory damages, punitive damages, together with interest, cost of suit, attorneys' fees, and such further relief as the court deems equitable and just.

### FOURTH CAUSE OF ACTION
### Strict Product Liability – Manufacturing Defect

121.    Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if each were fully and completely set forth herein and further alleges as follows:

122.    According to JUUL's labels, JUULpods are supposed to contain 60 mg/mL of nicotine.

123.    According to JUUL's '895 patent, JUULpods are intended to contain 4% benzoic acid by weight.

124.    The JUULpods manufactured by Defendants contained more than 60mg/mL nicotine.

125.    The JUULpods manufactured by Defendants contained more than 4% benzoic acid.

126.     As a result of these manufacturing defects, the already extreme risk of addiction posed by JUUL e-cigarettes was heightened to an extent that increased the already extreme addiction risks the JUUL e-cigarettes posed.

127.     Further, in creating a sleek device and utilizing a special e-juice known as JuulSalts or nicotine salts, Defendants placed a highly addictive product into the stream of commerce that could be readily concealed.  Based on information and belief, Defendants manufactured an even more addictive product than the one they designed.

128.     These defects were a substantial factor in Plaintiff Ian McCarthy's nicotine addiction and injuries.

129.     Additionally, to the extent any claims are made under the laws of the State of Missouri, including but necessarily limited to the claims of Plaintiff, and the extent this Court finds that Missouri statutory laws found at Mo. Rev. Stat. §§ 537.760 *et seq.* are applicable to this case, Plaintiff alleged that Defendants manufactured, transferred, sold JUUL products in the course of its business, the products were used by Plaintiff in a reasonably anticipated manner, the JUUL e-cigarettes and pods were defectively designed and unreasonably dangerous and carried a defective warning at the time of sale.  JUUL products caused Plaintiff's injuries.  JUUL e-cigarettes and pods were expected to and did reach the Plaintiff without substantial change in their condition.

130.     Plaintiff states that Defendants are liable under the provisions of Mo. Rev. Stat. §§ 537.760 *et seq.*

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and requests compensatory damages, punitive damages, together with interest, cost of suit, attorneys' fees, and such further relief as the court deems equitable and just.

## FIFTH CAUSE OF ACTION
### Strict Product Liability – Defect Due to Inadequate Warning

131.    Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if each were fully and completely set forth herein and further alleges as follows:

132.    The JUUL products manufactured and/or sold by Defendants were further designed defectively because the JUUL e-cigarettes and pods were not labeled with an adequate warning.

133.    The lack of an adequate warning label on JUUL devices enclosures and on JUULpod enclosures rendered these products defective and not reasonably safe for their intended or foreseeable use.

134.    The warning label on JUUL packaging and/or on JUUL's website was inadequate and rendered JUUL e-cigarettes defective and not reasonably safe for their intended use.

135.    The warning, or lack thereof, Defendants placed on the JUUL website and on JUUL packaging did not accurately convey the addicting nature of JUUL e-cigarettes.  Specifically, the warnings failed to inform potential users that JUUL products contained levels of nicotine far higher than traditional cigarettes and that JUUL products were designed to deliver nicotine in a manner that made if far more likely users would become addicted to it.

136.    Defendants failed to warn Plaintiff and the general public that the use of JUUL products could result in severe nicotine addiction and other severe injuries such as heart problems, lung problems, stroke, seizures, mental health problems, and other severe and life-threatening injuries.

137.    If Plaintiff and/or the general public had been properly warned of the defects and dangers of JUUL products, and of the frequency, severity, and duration of the risks associated with JUUL e-cigarettes, Plaintiff would not have purchased and consumed JUUL products, and the general public would likely not be suffering from a severe nicotine epidemic.

138.    Additionally, to the extent any claims are made under the laws of the State of Missouri, including but necessarily limited to the claims of Plaintiff, and the extent this Court finds that Missouri statutory laws found at Mo. Rev. Stat. §§ 537.760 *et seq.* are applicable to this case, Plaintiff alleged that Defendants manufactured, transferred, sold JUUL products in the course of its business, the products were used by Plaintiff in a reasonably anticipated manner, the JUUL e-cigarettes and pods were defectively designed and unreasonably dangerous and carried a defective warning at the time of sale.  JUUL products caused Plaintiff's injuries.  JUUL e-cigarettes and pods were expected to and did reach the Plaintiff without substantial change in their condition.

139.    Plaintiff states that Defendants are liable under the provisions of Mo. Rev. Stat. §§ 537.760 *et seq.*

140.    As a direct and proximate result of the inadequate, defective, and lack of warnings and instructions, Plaintiff suffered injuries and damages as summarized herein.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and requests compensatory damages, punitive damages, together with interest, cost of suit, attorneys' fees, and such further relief as the court deems equitable and just.

### SIXTH CAUSE OF ACTION
**Strict Product Liability – Non-Conformance with Representations**

141.    Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if each were fully and completely set forth herein and further alleges as follows:

142.    Defendants had a duty to accurately and truthfully represent to youth, schools, Plaintiff, consumers, and the community that JUUL products had not been adequately tested and found to be safe and effective alternatives to traditional cigarettes.  The representations by Defendants, in fact, were false.

143.    Defendants' material representations concerning JUUL products while they were involved in their manufacture, sale, testing, quality, assurance, quality control, and distribution in interstate commerce, were justifiably relied on by Plaintiff.  Defendants materially represented JUUL's high risk of unreasonable and dangerous adverse side effects.

144.    Defendants materially misrepresented that JUUL products have no serious side effects different from traditional cigarettes and/or similar products to youth, schools, Plaintiff, consumers, and the community.

145.    Additionally, to the extent any claims are made under the laws of the State of Missouri, including but necessarily limited to the claims of Plaintiff, and the extent this Court finds that Missouri statutory laws found at Mo. Rev. Stat. §§ 537.760 *et seq.* are applicable to this case, Plaintiff alleged that Defendants manufactured, transferred, sold JUUL products in the course of its business, the products were used by Plaintiff in a reasonably anticipated manner, the JUUL e-cigarettes and pods were defectively designed and unreasonably dangerous and carried a defective warning at the time of sale.  JUUL products caused Plaintiff's injuries.  JUUL e-cigarettes and pods were expected to and did reach the Plaintiff without substantial change in their condition.

146.    Plaintiff states that Defendants are liable under the provisions of Mo. Rev. Stat. §§ 537.760 *et seq.*

147.    As a foreseeable, direct, and proximate result of the misrepresentation of Defendants as set forth herein, Defendants knew, and had reason to know, that JUUL products had been insufficiently tested, or had not been tested at all, and that they lacked adequate warnings, and that they created a high risk and/or higher than acceptable risk, and/or higher than reported and represented risk, of adverse side effects, including nicotine addiction, nicotine poisoning, seizures, stroke, heart problems, lung/respiratory problems, cavities, mental health problems,

pregnancy/birth defects, loss of life's enjoyment, and other severe personal injuries, which are permanent and lasting in nature.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and requests compensatory damages, punitive damages, together with interest, cost of suit, attorneys' fees, and such further relief as the court deems equitable and just.

## SEVENTH CAUSE OF ACTION
### Negligence (Design and Marketing)

148.   Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if each were fully and completely set forth herein and further alleges as follows:

149.   Defendants had a duty to use reasonable care in designing, testing, inspecting, manufacturing, packaging, labeling, marketing, distributing, training, and preparing written instructions and warnings for JUUL products, but failed to do so.

150.   Defendants knew, or in the exercise of reasonable care should have known, that JUUL products were defectively and unreasonably designed and/or manufactured, and was unreasonably dangerous and likely to injure consumers, like Plaintiff, using JUUL products. Defendants should have known that Plaintiff and consumers alike were unaware of the dangerous and defects inherent in JUUL products.

151.   As a direct and proximate result of Defendants' negligence in designing, testing, inspecting, manufacturing, packaging, labeling, marketing, and distributing JUUL products, and Defendants' negligence in failing to warn and instruct others of the risks and side effects caused by JUUL products, Plaintiffs suffered injuries and damages as summarized herein.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and requests compensatory damages, punitive

damages, together with interest, cost of suit, attorneys' fees, and such further relief as the court deems equitable and just.

## EIGHTH CAUSE OF ACTION
### Breach of Express Warranty

152.    Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if each were fully and completely set forth herein and further alleges as follows:

153.    At all relevant and material times, Defendants manufactured, distributed, advertised, promoted, labeled, and sold JUUL products.

154.    At all relevant times, Defendants intended that JUUL products be used in the manner that Plaintiff in fact used them and Defendants expressly warranted that each JUUL product was safe and fit for use by consumers, that side effects JUUL use were minimal and less significant than traditional cigarettes, and that it was adequately tested and fit for its intended use.

155.    At all relevant times, Defendants were aware that consumers, including Plaintiff, would use JUUL products; which is to say that Plaintiff was a foreseeable user of JUUL.

156.    Defendants' JUUL products were expected to reach and did in fact reach consumers, including Plaintiff and consumers alike, without substantial change in the condition in which it was manufactured and sold by Defendants.

157.    Defendants expressly warranted that the JUUL device was a safe and effective e-cigarette and alternative to traditional cigarettes.

158.    Defendants expressly warranted that JUUL products were safe and effective and presented a lower risk of tobacco-related illness and are less harmful than one or more other commercially marketed tobacco products.

159.    Defendants expressly warranted that JUUL products were safe and effective when they engaged in a wide variety of outreach efforts to youth and schools and maintained that JUUL was "totally safe."

160.    Defendants expressly warrant that their product is a safe and effective and that JUUL products are a great way for consumers to "make the switch" from traditional cigarettes.

161.    In reliance upon Defendants' express warranty, Plaintiff purchased and utilized JUUL products.

162.    At the time of making such express warranties, Defendants knew or should have known that the Defendants' JUUL products did not conform to these express representations because Defendants' JUUL device was not safe and had numerous side effects, many of which Defendants did not accurately warn about, thus making JUUL products unreasonably safe for consumers.

163.    Members of the social media community, consumers, as well as Plaintiff, relied upon the representations and warranties of Defendants in connection with the use recommendation and description of JUUL.

164.    The JUUL products manufactured and sold by Defendants did not conform to these express representations because it caused serious injury to Plaintiff when used as recommended and directed.

165.    Defendants breached their express warranties to Plaintiff in that JUUL products were not fit and safe, nor were consumers adequately warned of the risks associated with JUUL, nor were JUUL products adequately tested.

166.    As a direct and proximate result of Defendants' breaches of the aforementioned express warranties, Plaintiff has suffered harm, damages, and economic loss and will continue to

suffer severe personal injuries, pain and suffering, severe emotional distress, financial or economic loss, including, but not limited to, obligations for medical services and expenses, impairment of personal relationships, and other damages.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and requests compensatory damages, punitive damages, together with interest, cost of suit, attorneys' fees, and such further relief as the court deems equitable and just.

**NINTH CAUSE OF ACTION**
**Breach of Implied Warranty**

167.    Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if each were fully and completely set forth herein and further alleges as follows:

168.    At all relevant and material times, Defendants manufactured, distributed, advertised, promoted, labeled, and sold the Defendants' JUUL products.

169.    At all relevant times, Defendants intended that JUUL products be used in the manner that Plaintiff in fact used them and Defendants impliedly warranted each JUUL e-cigarette and its component parts to be of merchantable quality, safe, and fit for such use, and that it was adequately tested.

170.    Defendants were aware that consumers, including Plaintiff, would use JUUL e-cigarettes and products in the manner directed and intended; which is to say that Plaintiff was a foreseeable user of the Defendants' JUUL e-cigarettes.

171.    The Defendants' JUUL products were expected to reach and did in fact reach consumers, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendants.

172.    Defendants breached various implied warranties with respect to the JUUL e-cigarettes and products, including the following particulars:

    i.    Defendants represented to Plaintiff and the general public through its marketing materials, advertising, representatives, seminar presentations, labeling, and website that JUUL products were safe and fraudulently withheld and concealed information about the substantial risks of nicotine addiction and serious injury associated with using JUUL e-cigarettes and pods;

    ii.    Defendants represented to Plaintiff and the general public that JUUL e-cigarettes and products were safe and/or safer alternatives to traditional cigarettes, and fraudulently concealed information which demonstrated that JUUL products were not safer alternatives; and

    iii.    Defendants represented to Plaintiff and the general public that JUUL products were effective alternatives to "make the switch" from traditional cigarette use and reduce nicotine consumption, and fraudulently concealed information regarding the true efficacy of JUUL e-cigarettes and pods.

173.    In reliance upon Defendants' implied warranty, Plaintiff used JUUL e-cigarettes and pods as directed and in the foreseeable manner normally intended, recommended, promoted, and marketed by Defendants.

174.    Defendants breached their implied warranty to Plaintiff in that the Defendants' JUUL products were not of merchantable quality, safe and fit for their intended use, or adequately tested.

175.    As a direct and proximate result of Defendants breaches of the aforementioned implied warranties, Plaintiff was caused and in the future will be caused to suffer severe personal injuries, pain and suffering, severe emotional distress, financial or economic loss, and other damages.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and requests compensatory damages, punitive damages, together with interest, cost of suit, attorneys' fees, and such further relief as the court deems equitable and just.

## TENTH CAUSE OF ACTION
### Unjust Enrichment

176.    Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if each were fully and completely set forth herein and further alleges as follows:

177.    As described in this Complaint, Defendants knowingly sold and/or partnered to sell JUUL products to Plaintiff Ian McCarthy and the public in a manner that was unfair, unreasonable, unconscionable, and oppressive.

178.    As a result of Defendants' intentional, unlawful, and deceptive actions described above, Defendants were unjustly enriched at the expense of Plaintiff Ian McCarthy.

179.    Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits without restitution to Plaintiff Ian McCarthy for the monies paid to Defendants for its defective JUUL products.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and requests compensatory damages, punitive damages, together with interest, cost of suit, attorneys' fees, and such further relief as the court deems equitable and just.

34

## ELEVENTH CAUSE OF ACTION
### Deceptive and Unfair Trade Practices Act
### (Mo. Stat. §§ 407.010 through 407.307)

180.   Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if each were fully and completely set forth herein and further alleges as follows:

181.   Defendants are "persons" as defined in Mo. Stat. § 407.010.

182.   Defendants "advertised" and placed "merchandise" into the stream of "commerce" as defined in Mo. Stat. § 407.010.

183.   Defendants committed one or more unfair or deceptive acts or practices before, during, and/or after the consumer transaction with Plaintiff in violation of Consumer Protection Laws.

184.   Specifically, Defendants knew or should have known that the subject of the consumer transaction, JUUL e-cigarettes and pods, were not of the quality that Defendants represented them to be and were in fact highly dangerous and highly addictive, which was unfair and/or deceptive to Plaintiff.

185.   Defendants actions before, during, and/or after the consumer transaction with Plaintiff were unconscionable and violated Consumer Protection Laws.

186.   Specifically, Defendants entered into the consumer transaction with Plaintiff and knowingly made false and misleading statements which Plaintiff relied on to Plaintiff's detriment including but not limited to the safety and effectiveness of JUUL e-cigarettes in violation of Consumer Protection Laws.

187.   When Defendants entered into the consumer transaction with Plaintiff, they knew that their representations were false, and they made the material representations knowingly without

Plaintiff having any knowledge of their falsity which was unfair, deceptive, and/or unconscionable to Plaintiff.

188.    Plaintiff seeks damages pursuant to Missouri Consumer Protection Laws for Defendants violations.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and requests compensatory damages, punitive damages, together with interest, cost of suit, attorneys' fees, and such further relief as the court deems equitable and just.

## TWELFTH CAUSE OF ACTION
### Infliction of Emotional Distress

189.    Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if each were fully and completely set forth herein and further alleges as follows:

190.    Defendants knowingly and recklessly manufactured, designed, developed, tested, labeled, marketed, and sold harmful JUUL products to Plaintiff.

191.    Defendants intentionally and recklessly concealed the harmful risks associated with JUUL products from Plaintiff and the public on multiple occasions and continue to do so to this day.

192.    Defendants intentionally and recklessly misrepresented the quality and safety of JUUL products to Plaintiff and the public on multiple occasions and continue to do so to this day.

193.    Defendants' conduct – including preying on youth, poisoning consumers for profit, and intentionally misrepresenting the risks and adverse side effects associated with their product – is so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency.  Defendants' conduct is atrocious and utterly intolerable and is in fact the cause of Plaintiff's severe emotional distress and injuries alleged herein.

194.     Defendants intentional and reckless conduct caused, and continues to cause, severe emotional distress on Plaintiff Ian McCarthy.  Defendants interjected their product and themselves into Plaintiff's life, causing severe stress, anxiety, strain, and emotional distress.  The severe nicotine addiction caused by JUUL resulted in behavior and symptoms so severe that Plaintiff Ian McCarthy has been diagnosed with anxiety and seeks treatment by a psychiatrist.  Plaintiff's nicotine addiction has resulted in a loss of work opportunity and loss of mental control for an addiction he never intended to develop and that he now seeks treatment for.

195.     Plaintiff's nicotine addiction is no accident; rather it is the result of Defendant' intentional, calculated behavior to addict him and the public to nicotine to create life-long customers.  As a direct and proximate result of Defendants' outrageous conduct, Plaintiff is left with the choice to either fight a nicotine addiction or sustain a nicotine addiction.  Ian McCarthy has likewise suffered economic damages related to addressing his nicotine addiction and the consequences thereof.

196.     Plaintiff was directly impacted by Defendants' intentional actions, in that Plaintiff has sustained and will continue to sustain emotional distress, severe physical injuries, economic losses, and other damages as a direct result of the decision to purchase JUUL products manufactured, designed, sold, marketed, labeled, and distributed by Defendants.

197.     Defendants continue to intentionally misrepresent the quality, safety, dangers, and contradictions of JUUL products to Plaintiff individually and the public after Plaintiff sustained emotional distress, severe physical injuries, and economic loss.

198.     Defendants continue to intentionally misrepresent the quality, safety, dangers, and contradictions of JUUL products to Plaintiff individually and the public knowing that doing so

would cause the Plaintiff to suffer additional continued emotional distress, severe physical injuries, and economic loss.

199.    As a proximate result of the Defendants' conduct, Plaintiff has been injured, sustained severe and permanent pain, suffering, anxiety, depression, impairment, loss of enjoyment of life, and economic damage.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and requests compensatory damages, punitive damages, together with interest, cost of suit, attorneys' fees, and such further relief as the court deems equitable and just.

## PRESERVATION OF CLAIMS

200.    Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if each were fully and completely set forth herein and further alleges as follows:

201.    Many States have recently enacted tort reform statutes with "exclusive remedy" provisions.  Courts have yet to determine whether these exclusive remedy provisions eliminate or supersede, to any extent, state common law claims.  If during the pendency of this action this court makes any such determination, Plaintiff hereby specifically makes claim to and preserves any State claim based upon any exclusive remedy provision, under any state law this court may apply, to the extent not already alleged above.

202.    To the extent that Defendants may claim that one or more of Plaintiff's claims are barred by the applicable statute of limitations, Plaintiff asserts that the statute of limitations is and has been tolled by Plaintiff's discovery that his injuries were caused by Defendants' defective product and failure to properly and adequately warn of the products' risks, all as more fully set forth in this Complaint, after the injury sustained by the Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, the acts and omissions of Defendants, as set forth above, are the result of negligence and willful and malicious or fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of other, including Plaintiff Ian McCarthy.   The Defendants continue to engage in such behavior against other individuals and such behavior further aggravates Plaintiff Ian McCarthy's damages, which further aggravation is known, or should be known to Defendants.  As a direct and proximate result of Defendants' action and/or inaction, Plaintiff Ian McCarthy has suffered and will continue to suffer severe and extensive damages. Thus, Plaintiff respectfully requests that this Court grant the following relief:

A. An order enjoining Defendants from further negligent, deceptive, unfair, and unlawful conduct as alleged herein;

B. Award Plaintiff actual, compensatory, and consequential damages in an amount to be determined at trial;

C. Award Plaintiff other monetary and equitable relief for diagnostic testing, medical monitoring, and nicotine addiction programs;

D. Aware Plaintiff restitution;

E. Award Plaintiff punitive/exemplary damages in an amount to be determined at trial;

F. Award Plaintiff attorneys' fees and the costs of this action;

G. Award pre-judgment and post-judgment interest;

H. Such other and further relief as the Court deems necessary and proper.

Plaintiff demands judgement in his favor and seeks relief against Defendants.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Richard W. Schulte
Richard W. Schulte (MO Bar# 69566)
WRIGHT & SCHULTE, LLC
865 S. Dixie Dr.
Vandalia, Ohio 45377
Tel: (937) 435-7500
Fax: (937) 435-7511
rschulte@yourlegalhelp.com
*Counsel for Plaintiff*